OPINION
{¶ 1} Thomas Johnson appeals from his conviction in the Montgomery County Common Pleas Court of robbery. The facts underlying Johnson's conviction are as follows. *Page 2 
 {¶ 2} On October 30, 2006, Johnson and James Hall played basketball at the Moraine Recreation Center. Afterwards, they went to the Dixie Dairy Dream to get a "slaw dog" after the store had closed at 9:00 p.m. The lights to the outside of the store were turned off but the interior lights to the store were on so the owner, Ronald Enderle, could close down the daily operation. Enderle was in the process of counting one of his cash drawers when a young black male approached the front serving window and asked for a "slaw dog." Enderle informed the young man that the store was closed and everything was put away. The young man then asked for a bag of chips and Enderle said, "all right, wait a second" and then took the cash drawer from under the window and moved it back to the kitchen.
 {¶ 3} Enderle walked back to the front window and started to open the window. Enderle testified at trial as follows:
 {¶ 4} "A Went up to sell him the chips, and had my hand to open the window, and I said, do you have any money, right? And at that point in time he said no, no man, I don't have any money. Okay.
 {¶ 5} "Q What happened after that?
 {¶ 6} "A And so I said, well, I can't help you. And he said well, I'm fixing to rob you, okay? And at that point in time he had his hand — he put his hand in his pocket.
 {¶ 7} "Q Okay.
 {¶ 8} "A And it's like, excuse me. I couldn't believe he said that, right. And I said excuse me. He said I'm fixin' — I'm fixin' to rob you.
 {¶ 9} "Q Did he do anything with his pocket whenever he said he that to you?
 {¶ 10} "A When he said it the second time is when he started — he put his hand up, okay, in his pocket, right? Started waiving it around. *Page 3 
 {¶ 11} "Q What did that indicate to you?
 {¶ 12} "A That he had a gun, he had a weapon of some kind, he had a gun, yeah.
 {¶ 13} "Q Okay. Were you scared?
 {¶ 14} "A I was pretty concerned. I — yeah, yeah, you never know — you never know what's going to happen.
 {¶ 15} "Q Exactly. You were there by yourself, correct?
 {¶ 16} "A Yea, ma'am.
 {¶ 17} "Q Now, after he does that and motions toward you with his hand in his pocket, what do you do?
 {¶ 18} "A Well, I just — I start backing away, right? Started backing away saying hey, he said I'm fixing to rob you. I said, dude, you better get your butt out of here because I'm fixing to call the police, right?
 {¶ 19} "Q Okay.
 {¶ 20} "A So, I'm backing away watching his hands, and just keep backing up.
 {¶ 21} "Q Is that — is that a reflex that you've learned from being in the military, or — why did you react that way?
 {¶ 22} "A I — I — I don't know. It's just something — you know what I mean. What I've told everybody before, if he'd shown the gun you'd have seen me move a lot quicker, right.
 {¶ 23} "Q Right, right.
 {¶ 24} "A But at that point in time it was just like keep him distracted, get back, and get on — get — get on the phone, right. Call the police
 {¶ 25} "Q And did you call the police? *Page 4 
 {¶ 26} "A Yes, ma'am."
 {¶ 27} When the police arrived, Enderle showed them a video of the robbery. Enderle admitted to police he never saw the young man produce a weapon.
 {¶ 28} Officer Brian Fugate of the Moraine Police Department responded to Enderle's call within three minutes. Fugate discovered two yong men sitting on a nearby bus stop bench. One was a young black male wearing clothing as described by Enderle and a young white male. Fugate and Officer Norris approached the young men with their guns drawn and had them lay on the ground while handcuffing them. Fugate did not find a weapon on either of them. Johnson was questioned by Officer Fugate and Johnson told him he tried to buy a slaw dog from Enderle at the Dixie Dairy Dream but Enderle told him the store was closed. Johnson said he and his companion left and sat at the bus stop waiting for a bus. Fugate told Johnson that he had viewed the video and he needed to know "what really happened." (Tr. 46.) Fugate testified that Johnson then told him he got upset when Enderle refused to microwave a slaw dog for him and he told Enderle, "you know what, I don't have any money anyway. I'm about to rob you." Johnson said Enderle seemed stunned by his statement and he repeated "I'm about to rob you" while he pointed a cell phone in his pocket at Enderle like it was a gun. (Tr. 47.) On cross-examination, Fugate said Johnson gave a written statement in which he said he was upset with Enderle but had no intention of actually robbing him. He stated that he thought "he'd kind of play with him a little bit." (Tr. 49.) On redirect, Fugate stated Enderle appeared "shaken" when he interviewed him.
 {¶ 29} James Hall testified he was with Johnson when they went to the Dairy Dream. He testified he only heard bits and pieces of Johnson's conversation with Enderle. He testified neither he nor Johnson had a gun on them that day. *Page 5 
 {¶ 30} Johnson testified he had never been to the Dairy Dream store before the night he was arrested. He testified Hall suggested that he order a slaw dog. Johnson said Enderle told him the store was closed and the food was in the cooler. Johnson said he asked Enderle if he could heat one up for him in the microwave, but Enderle reiterated the store was closed. Although Enderle initially agreed to sell Johnson some potato chips, he changed his mind. Johnson said Enderle acted arrogant and basically "was messing" with him. (Tr. 65.) Johnson said he then told Enderle "I'm about to rob you." (Tr. 67.) Johnson said when Enderle acted like he did not hear him, he again told Enderle "I'm about to rob you." He said he reached into his jacket when his cell phone vibrated. Johnson said he told Enderle he was just playing and he put his hands in the air and said, "you have a nice night." (Tr. 69.) Johnson said he had no weapon on him and was not planning on robbing Enderle, that all he wanted was a hot dog. (Tr. 64.) He testified he thought Enderle was playing when he said he was calling the police because he knew I was playing. (Tr. 77.)
 {¶ 31} At the conclusion of all the evidence, the trial court concluded that Johnson did not have a purpose to commit a theft offense. The court noted that the culpability state for robbery is knowingly committing a theft offense by the use of force. The court noted that Johnson's actions were stupid and the court would have found him not guilty if purpose were a required culpability state.
 {¶ 32} "The element that I struggle with was the attempted theft. And again, it's because, and sometimes the law is not completely fair. Again, it's because, in my mind, when you said those words and did what you did, it was not your intent, it was not your purpose — I want to make sure I am very clear about this — it was not your purpose to commit or attempt to commit a theft offense. All right? *Page 6 
 {¶ 33} "You were, in my mind, acting very stupidly, obviously. And you were trying to, for lack of a better word, mess with Mr. Enderle, probably because you didn't like the way he treated you. I was young once. I probably said and did some things that I shouldn't have done when under those types of circumstances, but that gets me back to what I started out with. And that is the definition of knowingly, which again is the mental state that is at issue in this case.
 {¶ 34} "And knowingly is defined both by OJI and by statute in the following way, `a person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result. A person has knowledge of circumstances accidentally.' And there are some other words, but that's the basis of it.
 {¶ 35} "And so, if the mental state that was at issue in this case was purpose, or purposely, I would have found you not guilty because you did not have a purpose — let me back up — you did not, when you were there saying I'm about to rob you and did what you did with your hand, it wasnot your conscious objective to commit a theft offense.
 {¶ 36} "But when that mens rea, when that mental state is instead as it is knowingly, I have to find beyond a reasonable doubt that you did act knowingly by stating to Mr. Enderle, I'm about to rob you, and then doing with your hand what you did, because again, `a person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result.' That certain result being Mr. Enderle believing that he was being robbed, as reflected by his testimony, which I found believable and credible.
 {¶ 37} "So, as I said, sometimes the law can be a bit unfair. I think in some ways it is unfair in this case given the particular facts. But I am duty-bound to follow the law *Page 7 
as I see the law. And based upon that, I have to find beyond a reasonable doubt that you did commit this robbery. And my verdict is accordingly, guilty." (Tr. 85-89.)
 {¶ 38} In his sole assignment, Johnson argues that his conviction was based on insufficient evidence and was against the manifest weight of the evidence. We agree that it was.
 {¶ 39} Pursuant to R.C. 2911.02(A)(3), robbery is defined as:
 {¶ 40} "(A) No person, in attempting or committing a theftoffense or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 41} "* * *
 {¶ 42} "(3) Use or threaten the immediate use of force against another."
 {¶ 43} Theft is defined by R.C. 2913.02 at (A): "No person, withpurpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * (1) without the consent of the owner or person authorized to give consent * * * ." It is fundamental that to prove theft there must therefore be an intent to steal (or as stated in the Latin form, animus furandi).
LaFave, Scott, Criminal Law at 637. The trial court specifically found that Johnson had no purpose to commit a theft but intended only to mess with Mr. Enderle because he did not like the way Enderle treated him. The State having failed to convince the trier of fact that Johnson had an intent to deprive Enderle of his property, the evidence was insufficient to sustain Johnson's conviction for robbery. The evidence was consequently also against the manifest weight of the evidence.[1]
The assignment of error is Sustained. *Page 8 
 {¶ 44} The Judgment of the trial court is Reversed and the Appellant is ordered Discharged.
WOLFF, P.J., and FAIN, J., concur.
[1] The evidence would undoubtedly have supported a conviction for aggravated menacing but Johnson was not charged with that offense. *Page 1